IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-147-D

| | |
|---|---|
| ROSE ACRE FARMS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NORTH CAROLINA DEPARTMENT )<br>OF ENVIRONMENT AND NATURAL )<br>RESOURCES, at al., )<br>)<br>Defendants. ) | **ORDER** |

On March 12, 2014, Rose Acre Farms, Inc. ("Rose Acre" or "plaintiff"), filed an action for declaratory judgment [D.E. 1, 5]. Rose Acre seeks an order declaring that certain discharges of pollutants from its farm are exempt from federal permitting requirements and that defendant North Carolina Department of Environment and Natural Resources ("DENR") does not have legal authority under the federal Clean Water Act to require Rose Acre to obtain a National Pollutant Discharge Elimination System ("NPDES") permit. See Compl. [D.E. 5] 19–20. On May 14, 2014, three environmental groups moved to intervene on defendants' behalf (collectively, "defendant-intervenors") [D.E. 25]. On July 8, 2014, the court granted the motion to intervene [D.E. 44].

On August 29, 2014, defendant-intervenors moved for judgment on the pleadings [D.E. 50]. On September 2, 2014, defendants moved to dismiss the complaint for lack of subject-matter jurisdiction [D.E. 53].[1] On September 15, 2014, the United States filed an amicus brief in support of defendants' motion to dismiss and defendant-intervenors' motion for judgment on the pleadings [D.E. 57]. On October 31, 2014, Rose Acre responded in opposition to both motions [D.E. 63]. On

---

[1] Defendant van der Vaart, the Secretary of DENR, has been automatically substituted for former Secretary John E. Skvarla III. See Fed. R. Civ. P. 25(d).

November 13, 2014, Rose Acre moved for summary judgment [D.E. 65]. On December 1, 2014, the court extended defendants' and defendant-intervenors' deadline to respond to Rose Acre's motion for summary judgment to 30 days after the court ruled on their pending motions [D.E. 73]. On December 5, 2014, defendants replied to Rose Acre's response [D.E. 85].

On January 8, 2015, the court denied defendant-intervenors' motion for judgment on the pleadings [D.E. 90]. On January 9 and 12, 2015, three amici filed briefs in support of Rose Acre's motion for summary judgment [D.E. 91, 92]. As explained below, the court grants defendants' motion to dismiss for lack of subject-matter jurisdiction.

I.

Rose Acre owns and operates an egg farm in Hyde County, North Carolina. Compl. ¶ 1. The Hyde County farm has 3.2 million laying hens in 12 high-rise, enclosed hen houses. Id. ¶ 32. Each hen house is two stories tall. Id. ¶ 33. Manure accumulates at the bottom of the hen houses, and is periodically removed and composted. Id. Large fans ventilate the hen houses, and this ventilation is necessary for the health of the hens. Id. ¶ 34. After the eggs are collected and washed, the wash water is "land applied." Id. ¶ 35. There has never been a discharge of process wastewater from any production area of the farm into United States or North Carolina waters. Id. ¶ 37.

Pursuant to North Carolina regulations, Rose Acre built a wet detention pond to gather precipitation that falls on the ground around the farm. Id. ¶ 38. Ventilation systems blow dust, feathers, and manure out of the hen houses, and precipitation may pick up small amounts of these materials in the area surrounding the hen houses. Id. ¶¶ 8, 38. A few times a year, the detention pond discharges into a nearby canal. Id. ¶ 38.

Defendants have required Rose Acre to obtain and be subject to an NPDES permit pursuant to the federal Clean Water Act, 33 U.S.C. §§ 1251 et seq. ("CWA"). Id. ¶¶ 42–43. In 2004, Rose Acre obtained its first five-year NPDES permit. Id. ¶¶ 43, 49. In 2009, following the Environmental Protection Agency's ("EPA") 2008 promulgation of a new rule ("2008 Rule"), DENR required Rose

2

Acre to apply for another permit. Id. ¶¶ 47–49. Rose Acre applied for a new permit, and DENR issued a final permit on September 24, 2010 ("2010 permit"). Id. ¶ 50. The 2010 permit required no discharge by Rose Acre and imposed best management practices ("BMPs"). Id. ¶ 52. In December 2010, Rose Acre challenged the 2010 permit in the North Carolina Office of Administrative Hearings ("OAH"), arguing that DENR lacked the authority to impose BMPs. Id. ¶ 53.

On March 15, 2011, the United States Court of Appeals for the Fifth Circuit vacated the 2008 Rule in pertinent part. Id. ¶ 54; see Nat'l Pork Producers Council v. EPA, 635 F.3d 738 (5th Cir. 2011). Specifically, the Fifth Circuit held that the EPA could not require permitting unless there was an actual discharge of pollutants into navigable water. Nat'l Pork Producers Council, 635 F.3d at 751–53. There has never been such a discharge at the Hyde County farm. See Compl. ¶ 44. In the North Carolina administrative proceeding, Rose Acre moved for summary judgment and argued that it need not obtain an NPDES permit because it never discharged pollutants into navigable water. Id. ¶ 55. In opposition to the motion, DENR claimed that the dust, feathers, and manure that landed on the ground outside the hen houses may have been carried into the detention pond and constituted discharges of pollutants into state waters. Id. ¶ 56.

The North Carolina administrative law judge ("ALJ") recommended summary judgment for Rose Acre. Id. ¶ 57. The North Carolina Environmental Management Commission ("EMC") rejected the ALJ's recommendation and ordered an evidentiary hearing to determine whether Rose Acre discharged pollutants. Id. ¶ 58. Rose Acre appealed to the North Carolina Superior Court. Id. ¶ 59. On January 4, 2013, the Superior Court remanded the case for an evidentiary hearing before the OAH. Id.

On March 12, 2014, Rose Acre filed suit in this court seeking a declaratory judgment [D.E. 5]. Rose Acre seeks an order declaring that any discharge that occurs as a result of precipitation carrying dust, feathers, and manure into other waters constitutes agricultural stormwater and is

3

therefore exempt from NPDES permitting requirements, and declaring that DENR lacks the authority to require Rose Acre to obtain an NPDES permit. See id. 19–20.

II.

Rose Acre alleges subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and 2201. Compl. ¶ 15. Defendants move to dismiss Rose Acre's complaint for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, alternatively, for the court to exercise its discretion under the Declaratory Judgment Act to decline jurisdiction or to abstain pursuant to Rule 12(b)(6). See [D.E. 53, 54]. A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted). A federal court "must determine that it has subject-matter jurisdiction over the case before it can pass on the merits of that case." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). Rose Acre bears the burden of establishing that this court has subject-matter jurisdiction in this action. See, e.g., Steel Co., 523 U.S. at 104; Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). When, as here, a defendant facially challenges the sufficiency of the allegations to support subject-matter jurisdiction, "the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

A.

In order for the court to have diversity jurisdiction under 28 U.S.C. § 1332, the matter in controversy must exceed the sum or value of $75,000 and the action must be between "citizens of different States." 28 U.S.C. § 1332(a)(1). Here, the court lacks subject-matter jurisdiction under 28 U.S.C. § 1332 because this action is not between "citizens of different states." Rose Acre has sued DENR and two agency employees in their official capacities. Compl. ¶¶ 12–14. See Moor v.

4

Cty. of Alameda, 411 U.S. 693, 717 (1973) ("There is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction."); Wisconsin v. Md. Nat'l Bank, 734 F.2d 1015, 1016 (4th Cir. 1984) (per curiam) ("It is settled that a State is not a citizen for purposes of diversity jurisdiction, and that 28 U.S.C. § 1332 does not deal with cases in which a State is a party."). As a state agency, DENR is "the arm or alter ego of the State" and is not a citizen for purposes of diversity jurisdiction. S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008) (quotation omitted). Similarly, state officials sued in their official capacities are also the alter ego of the state and are not considered citizens for diversity purposes. See, e.g., Comm'r of Labor v. Dillard's, Inc., 83 F. Supp. 2d 622, 626 (M.D.N.C. 2000); Eure v. NVF Co., 481 F. Supp. 639, 641 (E.D.N.C. 1979). Thus, defendants are not citizens for diversity purposes, and there is no action between citizens of different states. Accordingly, the court does not have diversity jurisdiction under section 1332.

B.

As for federal-question jurisdiction under 28 U.S.C. § 1331, a federal court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A claim generally arises under federal law when federal law creates the cause of action. See, e.g., Gunn v. Minton, 133 S. Ct. 1059, 1064 (2013); Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005); Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. 1, 8–9 (1983). Additionally, there is a "special and small category of cases in which arising under jurisdiction still lies" when state law creates the cause of action. Gunn, 133 S. Ct. at 1064 (quotation omitted). Within this category, arising-under jurisdiction "will lie over state-law claims that implicate significant federal issues." Grable, 545 U.S. at 312; see Franchise Tax Bd., 463 U.S. at 9 ("We have often held that a case 'arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law."); Smith v. Kan. City Title & Tr. Co., 255 U.S. 180, 199–202 (1921) (finding arising-under jurisdiction

5

where a state-law claim rested on "the alleged unconstitutionality of the acts of Congress"). "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 133 S. Ct. at 1065; see Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 699–701 (2006); Grable, 545 U.S. at 314; Flying Pigs, LLC v. RRAJ Franchising, LLC, 757 F.3d 177, 181–82 (4th Cir. 2014).

Rose Acre brings its claim under the Declaratory Judgment Act, 28 U.S.C. § 2201. Section 2201 permits the court to "declare the rights and other legal relations of any interested party seeking such declaration" when there is "a case of actual controversy within [the court's] jurisdiction." 28 U.S.C. § 2201(a). The Declaratory Judgment Act, however, merely creates a remedy, not jurisdiction. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950); Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 592 (4th Cir. 2004) (noting that a declaratory judgment action requires that the court possess "an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction)"); Interstate Petroleum Corp. v. Morgan, 249 F.3d 215, 221 n.7 (4th Cir. 2001) (en banc). In the context of a section 2201 claim for declaratory judgment, the court has jurisdiction over "suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." Franchise Tax Bd., 463 U.S. at 19; see Columbia Gas Transmission Corp. v. Drain, 237 F.3d 366, 370 (4th Cir. 2001) ("Thus, if the declaratory judgment plaintiff is not alleging an affirmative claim arising under federal law against the declaratory judgment defendant, the proper jurisdictional question is whether the complaint alleges a claim arising under federal law that the declaratory judgment defendant could affirmatively bring against the declaratory judgment plaintiff."); cf. Pinney v. Nokia, Inc., 402 F.3d 430, 442 (4th Cir. 2005) ("If a plaintiff can establish, without the resolution of an issue of federal law, all of the essential elements of his state law claim, then the claim does not

necessarily depend on a question of federal law.").[2] Thus, for subject-matter jurisdiction to exist, it must be the case that defendants could bring a claim arising under federal law against Rose Acre concerning its NPDES permit obligations.

Here, any claim that defendants could bring against Rose Acre concerning its NPDES permit obligation would be under state law. North Carolina law governs the permitting process, see N.C. Gen. Stat. § 143-215.10C, the administrative and judicial review of the permitting process, see N.C. Gen. Stat. §§ 143-215.1(e), 150B-23, 150B-43, and the enforcement mechanisms. See N.C. Gen. Stat. §§ 143-215.6A–215.6C. Accordingly, whether this court has subject-matter jurisdiction turns on whether such a state claim would fit into the "special and small category of cases" outlined in Gunn and Grable.

The first Grable factor requires that the state-law claim necessarily raise a federal issue. Gunn, 133 S. Ct. at 1065. The relevant state statute is N.C. Gen Stat. § 143-215.10C, which states, in part, that "No person shall . . . operate an animal waste management system for a dry litter poultry facility that is required to be permitted under 40 Code of Federal Regulations [section] 122 . . . without first obtaining an individual permit or a general permit under this Article." N.C. Gen. Stat. 143-215.10C(a). The statute requires that "[a]n owner or operator of . . . a dry litter poultry facility that is required to be permitted under 40 Code of Federal Regulations [section] 122 . . . shall apply for an individual National Pollutant Discharge Elimination System (NPDES) permit," and that an owner "may not discharge into waters of the State except in compliance with an NPDES permit." N.C. Gen. Stat. § 143-215.10C(a1). Other subsections of the permitting statute similarly reference federal regulations, including the 2008 Rule. See, e.g., N.C. Gen. Stat § 143-215.10C(b), (b1).

---

[2] In Franchise Tax Board, the Court suggested that there is jurisdiction if the declaratory judgment defendant's suit would "necessarily present a federal question." Franchise Tax Bd., 463 U.S. at 19. Despite this language, many circuits, including the Fourth Circuit, have interpreted the test as whether the declaratory judgment defendant could bring a federal claim against the plaintiff. See, e.g., Household Bank v. JFS Grp., 320 F.3d 1249, 1256–59 (11th Cir. 2003) (collecting cases); Drain, 237 F.3d at 370.

Thus, the North Carolina statute that determines whether persons must obtain an NPDES permit explicitly relies on federal regulations. Should the state bring an enforcement action based on a person's failure to obtain an NPDES permit, the state must prove (among other things) that federal law required the permit.[3] Accordingly, such an action would necessarily raise a federal issue. See, e.g., Gunn, 133 S. Ct. at 1065 (finding that a case raised a federal issue where the state claim required application of federal law); Grable, 545 U.S. at 315 (finding that a case raised a federal issue where an element of the state claim depended on the meaning of federal law); Nicodemus v. Union Pac. Corp., 440 F.3d 1227, 1234–35 (10th Cir. 2006).

As for the second Grable factor, the parties actually dispute the federal issue in this case. Rose Acre claims federal law does not obligate it to obtain an NPDES permit because any discharge that might occur falls under the CWA's agricultural stormwater exception. See Compl. ¶ 67. Specifically, Rose Acre contends that its obligations under N.C. Gen. Stat. § 143-215.10C to obtain an NPDES permit depends on its obligations under federal law and regulations.

As for the third Grable factor, the federal issue must be substantial. "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit. . . . The substantiality inquiry under Grable looks instead to the importance of the issue to the federal system as a whole." Gunn, 133 S. Ct. at 1066. There must be a "serious federal interest in claiming the advantages thought to be inherent in a federal forum." Grable, 545 U.S. at 313. "The determination of whether a federal issue is sufficiently substantial should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic." Ormet Corp. v. Ohio Power Co., 98 F.3d 799, 807 (4th Cir. 1996).

---

[3] N.C. Gen. Stat. § 143-215.10C(a) permits the EMC to require a person to obtain an individual permit even if not required under 40 C.F.R. § 122. Defendants do not argue, however, that this provision applies.

8

In Grable, the Court held that the federal issue at question, the meaning of a federal tax provision, was substantial because the government had "a direct interest in the availability of a federal forum to vindicate its own administrative action, and buyers . . . may find it valuable to come before judges used to federal tax matters." Grable, 545 U.S. at 315; see also Gunn, 133 S. Ct. at 1066; Empire Healthchoice, 547 U.S. at 700 ("The dispute [in Grable] centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as 'substantial,' and its resolution was both dispositive of the case and would be controlling in numerous other cases."). On the other hand, the Gunn Court held that the respondent's legal malpractice claim, which was based on a lawyer's alleged error concerning patent law, did not present a substantial federal issue. Gunn, 133 S. Ct. at 1066–68. Specifically, the Court noted the "backward-looking nature of a legal malpractice claim" and the lack of controlling or preclusive effect that a state-court decision would have on patent jurisprudence. Id. at 1066–67.

The federal issue here falls on the substantial side of the line. Like Grable, this case presents a "nearly 'pure issue of law'" as to whether the agricultural stormwater discharge exception in the CWA covers the possible precipitation-related discharge of litter and manure into Rose Acre's detention pond. See Empire Healthchoice, 547 U.S. at 700. Unlike the "backward-looking nature" of the legal malpractice claim in Gunn, resolution of this legal issue would affect the behavior of Rose Acre and DENR moving forward. Finally, an ultimate interpretation of the CWA's agricultural stormwater discharge exception, see 33 U.S.C. § 1362(14), would be controlling in similar cases involving other concentrated animal-feeding operations. Thus, the federal issue appears substantial.

The fourth and final Grable factor requires that the court's consideration of the federal issue not disturb "any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314. The Supreme Court has "consistently emphasized that, in exploring the outer reaches of [section] 1331, determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharms., Inc. v.

9

<mark>Case 5:14-cv-00147-D   Document 95   Filed 07/30/15   Page 9 of 18</mark>

Thompson, 478 U.S. 804, 810 (1986).

In passing the CWA, Congress stated that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ." 33 U.S.C. § 1251(b); see also Nat. Res. Def. Council, Inc. v. U.S. EPA, 16 F.3d 1395, 1399 (4th Cir. 1993) ("[P]rimary responsibility for establishing appropriate water quality standards is left to the states."). Moreover, Congress noted that"[i]t is the policy of Congress that the States . . . implement the permit programs under section[] 1342 . . . ." 33 U.S.C. § 1251(b). Pursuant to section 1342, the EPA must approve a state permit program if that state's laws "provide adequate authority to carry out the described [state] program." 33 U.S.C. § 1342(b). This adequate authority must include the ability to issue permits that apply and ensure compliance with the CWA's requirements. 33 U.S.C. § 1342(b)(1)(A). The EPA must suspend its issuances of permits within 90 days of approving a state's program. 33 U.S.C. § 1342(c)(1). Thus, a cooperating state becomes the primary enforcer of the CWA and administrator of the NPDES program. Shell Oil Co. v. Train, 585 F.2d 408, 410 (9th Cir. 1978) ("Thus, although the 1972 amendments gave the EPA the authority in the first instance to issue NPDES permits . . . , Congress clearly intended that the states would eventually assume the major role in the operation of the NPDES program."); Mianus River Pres. Comm. v. Adm'r, EPA, 541 F.2d 899, 905 (2d Cir. 1976) (noting that section 1342 "creates a separate and independent State authority to administer the NPDES pollution controls"). The state may even establish more stringent standards than the federal requirements. See, e.g., 33 U.S.C. § 1370; Shell Oil, 585 F.2d at 410 ("The role envisioned for the states . . . is a major one, encompassing . . . the right to enact requirements which are more stringent than the federal standards . . . .").

Viewing holistically the cooperative federal-state structure that the CWA created, it follows that Congress chose state courts to be the means by which parties may challenge state permitting decisions. See, e.g., District of Columbia v. Schramm, 631 F.2d 854, 863 (D.C. Cir. 1980) ("By

requiring states to maintain or create sufficient legal and equitable rights and remedies to deal with violations of state permits in order to exercise permit-granting powers under the Act, Congress must have intended that states apply their own law in deciding controversies involving state permits."); Mianus, 541 F.2d at 902, 906; Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co., No. 2:12-cv-3750, 2013 WL 6709957, at *12 (S.D. W. Va. Dec. 19, 2013) (unpublished) ("If a permitholder desires to attack the terms of an NPDES permit issued by the state permitting authority, it must bring an action challenging the terms of the permit under state procedures and cannot seek collateral review of the permit in federal court."); Nat. Res. Def. Council, Inc. v. Outboard Marine Corp., 702 F. Supp. 690, 694 (N.D. Ill. 1988) ("It follows, then, that direct review of EPA-uncontested state-issued permits is confined to state courts. . . . Such a federal-state division of roles and responsibilities is wholly consistent with the goals of the Act and the NPDES system."); cf. Gen. Motors Corp. v. EPA, 168 F.3d 1377, 1382–83 (D.C. Cir. 1999) (finding reasonable the EPA's interpretation of the CWA to preclude collateral attacks in federal court on state permitting decisions). As congressionally contemplated, North Carolina law allows for the judicial review of DENR permitting decisions in state court after administrative remedies have been exhausted. See N.C. Gen. Stat. § 150B-43 ("Any party or person aggrieved by the final decision in a contested case . . . is entitled to judicial review of the decision . . . ."); 40 C.F.R. § 123.30 ("All States that administer or seek to administer a program under this part shall provide an opportunity for judicial review in State Court of the final approval or denial of permits by the State . . . ."). This court's exercise of subject-matter jurisdiction over DENR's decision to require Rose Acre to obtain an NPDES permit, particularly in light of the ongoing state-court litigation, would upset the congressionally-determined balance between federal and state courts and would potentially open the doors to any party, aggrieved by a state agency's permitting decision under state law, to file a federal challenge.

Congress chose not to create a federal right of action for parties to challenge state permitting decisions. Congress instead permitted federal judicial review of the EPA's actions with respect to

11

state-approved permits or, in the absence of a state permitting program, the EPA's permitting decisions. 33 U.S.C. § 1369(b)(1); see also Mianus, 541 F.2d at 902 (concluding that the court lacked jurisdiction to hear a challenge to the state issuance of an NPDES permit). Although the absence of a federal right of action is not dispositive to the question of arising-under jurisdiction, it is relevant. See Grable, 545 U.S. at 318. Given the federal-state partnership structure in 33 U.S.C. § 1342, the lack of a federal right of action to challenge state permitting decisions serves as an "important clue to Congress's conception of the scope of jurisdiction to be exercised under [section] 1331." Id. Accordingly, the court may not review the merits of this action without "disturbing [the] congressionally approved balance of federal and state judicial responsibilities," id. at 314, and subject-matter jurisdiction does not exist.

In arguing that the court may exercise jurisdiction over this case without disturbing the congressionally-approved balance of responsibilities between federal and state courts, Rose Acre relies on two cases, one from the Tenth Circuit and one from the Fourth Circuit. See Nicodemus v. Union Pac. Corp., 440 F.3d 1227 (10th Cir. 2006); Ormet Corp. v. Ohio Power Co., 98 F.3d 799 (4th Cir. 1996). In Nicodemus, the plaintiffs filed numerous claims, including some state-law claims, in federal court against the defendant railroad company based on the defendant's granting of licenses to telecommunications companies to install fiber-optic cables on rights-of-way over the plaintiffs' property. Nicodemus, 440 F.3d at 1233–34. The defendant received the rights-of-way under federal land-grant statutes. Id. The district court dismissed the action sua sponte for lack of subject-matter jurisdiction. Id. at 1230. Although the Tenth Circuit originally affirmed the dismissal, after the Supreme Court decided Grable in the interim of en banc proceedings, the Tenth Circuit referred the case back to the original panel to consider the possible effects of Grable. Id. at 1231. In applying Grable, the Nicodemus court held that the case raised a federal issue because the plaintiff's state-law claims depended on the scope of the right-of-way easements, which were granted, and thus defined, by federal law. Id. at 1234–35. When examining the fourth Grable factor, the Tenth Circuit noted

12

that, although several proposed class actions involved the same type of property dispute, it would "be the rare state trespass and unjust enrichment case that so uniquely turns on a critical matter of federal law," and held that the exercise of federal jurisdiction would not disrupt the "federal-state division of labor." Id. at 1237 (quotation omitted). Accordingly, the Tenth Circuit reversed the district court's judgment dismissing the action for lack of subject-matter jurisdiction. Id.

Nicodemus is distinguishable. The federal issue in Nicodemus involved the scope of property rights that federal land-grant statutes granted to railroads and the effect of those rights-of-way on the traditional state-law claim of unjust enrichment or trespass. Id. at 1234. Nicodemus did not involve the formal federal-state partnership that the CWA contemplates, including the division of judicial review between federal and state courts.

In Ormet, the Fourth Circuit considered whether the plaintiff's claim of ownership over pollution allowances under the Clean Air Act ("CAA") created arising-under jurisdiction. Ormet, 98 F.3d at 801, 806. The CAA created a market for "allowances," or the right to discharge a certain amount of sulfur dioxide, by giving the EPA the authority to grant permits with transferable pollution allowances to owners or operators of fossil fuel-fired plants. Id. at 801–02. The plaintiff, an aluminum manufacturer, was contractually obligated to pay for a large portion of the defendant utility company's operating costs for the life of the defendant's power plant units. Id. The CAA specified that, where there were multiple owners of a fossil fuel power unit, each owner would receive a proportionate number of the allocated allowances. Id. at 803. Plaintiff argued that its contractual obligations made it a participating owner within the meaning of the CAA, thereby entitling plaintiff to a percent of the defendant's allowances. Id. at 802–03.

After rejecting plaintiff's argument that there was an implied private right of action in the CAA, the Fourth Circuit considered whether plaintiff's claim of ownership by virtue of its contractual obligations created a federal question sufficient to grant subject-matter jurisdiction under 28 U.S.C. § 1331. Noting the critical importance of the CAA's "creation of freely transferable

13

allowances" to the entire permit program, the Ormet court expressed concern that "[s]tate by state variations of interpretation about the nature and the initial title to allowances could create uncertainty in the market and thereby undermine the very device that Congress created for reducing pollution." Id. at 807. Because inconsistent state-court decisions could "undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal interest, justifying the exercise of jurisdiction by federal courts." Id. Accordingly, the Fourth Circuit concluded that the district court had subject-matter jurisdiction to hear the case, and vacated the lower court's dismissal for lack of jurisdiction. Id. at 808.

Ormet is distinguishable. In Ormet, the Fourth Circuit analyzed a federal regulatory regime under which the EPA directly granted permits with transferable pollution allowances to owners and operators of power plants, who could then transfer the allowances to other entities. The federal creation of this allowances market, in which the EPA initially allocated all permits, was central to the CAA's purposes. See id. at 807. Although the plaintiff's ownership claim was based on its contractual obligations to the defendant, its alleged ownership rights implicated the EPA's allocation methodology. Id. Here, in contrast, the CWA explicitly allows and encourages states to create their own permitting schemes to implement the NPDES system. When a state, such as North Carolina, meets the proper requirements under 33 U.S.C. § 1342(b), the EPA is thereafter barred from issuing NPDES permits and is relegated to a supervisory role in that state. See 33 U.S.C. § 1342(c). Moreover, Congress intended for state courts to handle challenges to state permits issued under the CWA. See, e.g., Schramm, 631 F.2d at 863; Mianus, 541 F.2d at 902, 906; Fola Coal, 2013 WL 6709957, at *12; Outboard Marine Corp., 702 F. Supp. at 694. Thus, the CWA contemplates a federal-state partnership that is fundamentally different from the federally-administered program at issue in Ormet.[4]

---

[4] Although the Fourth Circuit decided Ormet nine years before Grable, its discussion includes the principles underlying the Grable's factors. See Ormet, 98 F.3d at 807.

14

Here, the court declines to exercise subject-matter jurisdiction under 28 U.S.C. § 1331 over Rose Acre's claim because doing so would upset the congressionally-approved balance of responsibilities between federal and state courts with respect to the CWA's NPDES permitting scheme. In doing so, the court is confident that North Carolina appellate courts will faithfully consider non-binding, compelling precedent concerning whether DENR lacks the legal authority in this case to require Rose Acre to obtain a NPDES permit. See, e.g., Nat'l Pork Producers Council, 635 F.3d at 751–56; Alt v. U.S. EPA, 979 F. Supp. 2d 701, 710–15 (N.D. W. Va. 2013), appeal dismissed, No. 13-2527 (4th Cir. Oct. 2, 2014). Accordingly, because the court lacks jurisdiction under 28 U.S.C. § 1331 or § 1332, the court grants defendants' motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction.

III.

Alternatively, the court dismisses Rose Acre's claim pursuant to the court's discretion under the Declaratory Judgment Act. See, e.g., Ellis v. La.-Pac. Corp., 699 F.3d 778, 788 (4th Cir. 2012). The Declaratory Judgment Act states that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (emphasis added). "A district court's decision to entertain a claim for declaratory relief is discretionary and, as such, reviewed for abuse of discretion." Ellis, 699 F.3d at 788 (quotation and alteration omitted); see Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) ("We have repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." (quotation omitted)); Penn-Am. Ins. Co. v. Coffey, 368 F.3d 409, 412 (4th Cir. 2004); Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 421 (4th Cir. 1998) (per curiam) ("The [Declaratory Judgment] Act does not impose a mandatory obligation upon the federal courts to make such a declaration of rights. Rather, a district court's decision to entertain a claim for declaratory relief is discretionary and, as such, reviewed for abuse of discretion." (footnote omitted)).

15

Generally, a district court should not entertain a claim for declaratory judgment when the action is used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted." Aetna, 139 F.3d at 422 (quotation omitted). When there is a pending state matter, as here, the court's discretion is further guided by "such considerations as federalism, efficiency, and comity." Id.; see United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998); Mitcheson v. Harris, 955 F.2d 235, 237–40 (4th Cir. 1992). Specifically, "[t]o determine whether to proceed with a federal declaratory judgment action when a parallel state action is pending," the court should consider the following four factors:

> (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping.

Penn-Am. Ins., 368 F.3d at 412; see Kapiloff, 155 F.3d at 493–94.

On balance, in this case, these factors favor dismissal. As for the first factor, North Carolina has a strong interest in having its courts review the state's NPDES permitting process. Although the CWA provides minimum standards that a cooperating state must enforce, state law implements the regulatory scheme by determining how permits will be issued and how compliance will be maintained. In passing the CWA, Congress intended for states to have "primary responsibilities and rights . . . to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). Thus, this factor favors dismissal.

As for the second factor, Rose Acre commenced administrative litigation under North Carolina law in December 2010. Compl. ¶ 53. Litigation in state tribunals, including the North Carolina Superior Court, continues to date. The central issue in this case, however, involves an interpretation of federal law: does the agricultural stormwater discharge exception in 33 U.S.C. § 1362(14) cover the potential precipitation-related discharge of dust, feathers, and manure from Rose

16

Acre's hen houses? Nothing in the record suggests that state courts could resolve this question more efficiently than this court. Thus, this factor does not favor dismissal.

As for the third factor, the central issue in this case would create unnecessary entanglement between this court and North Carolina state courts. Rose Acre made the same legal arguments it presents here to the OAH and North Caroline Superior Court. Compl. ¶¶ 55–61. The North Carolina Superior Court has determined that DENR has the authority under state law to require Rose Acre to obtain the NPDES permit. Compl. ¶ 59; [D.E. 63] 16; cf. [D.E. 54-3] 9. Furthermore, Rose Acre's requested relief necessarily includes a declaration that DENR does not have the authority under state law to require the permit because the CWA provides only a floor for minimum compliance. See Compl. 19 (prayer for relief paragraph 4). Resolution of this matter on the merits would necessarily involve the application of state law, and a resolution in favor of Rose Acre would conflict with the North Carolina Superior Court's interpretation of state law. Although such a conflict is not impermissible, its potential favors dismissal. See, e.g., Kapiloff, 155 F.3d at 494 ("[S]ince both actions raised the same core issues of law and fact, and both actions aimed at determining the rights of the parties under the insurance policy, potential entanglement between the state and federal courts was a genuine possibility."); Mitcheson, 955 F.2d at 239–40 (finding that possible entanglement between state and federal courts supported dismissal of a federal declaratory judgment action in the interest of "promoting comity between federal and state courts").

As for the fourth factor, Rose Acre litigated in North Carolina state court the same issue it now raises here. See [D.E. 54-3] 9 (state court order noting Rose Acre's argument that "even if ammonia and other pollutants do enter the State waters via the fan's feathers and dust, that such activity is exempt as an agricultural stormwater discharge"). After the state court issued an adverse ruling on January 4, 2013, Rose Acre filed the instant action on March 12, 2014, seeking declaratory judgment on the same issue. See Compl. ¶¶ 59, 66–67. Essentially, Rose Acre has engaged in procedural fencing. See, e.g., Great Am. Ins. Co. v. Gross, 468 F.3d 199, 212 (4th Cir. 2006)

17

(describing procedural fencing as "a case in which a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum"); Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 377 (4th Cir.1994) (stating that procedural fencing is using an action for federal declaratory judgment "'to provide another forum in a race for res judicata' or 'to achieve a federal hearing in a case otherwise not removable'" (quotation and alteration omitted)), overruled on other grounds by Wilton v. Seven Falls Co., 515 U.S. 277 (1995). Thus, this factor also favors dismissal.

Here, three of the four factors favor dismissal. Thus, in the alternative to dismissal under Rule 12(b)(1), the court declines to exercise its discretion under the Declaratory Judgment Act to resolve Rose Acre's claim. Again, in doing so, the court is confident that the North Carolina appellate courts will review de novo the legal issues at stake and account for persuasive legal analysis of the issues. See, e.g., Nat'l Pork Producers Council, 635 F.3d at 751–56; Alt, 979 F. Supp. 2d at 710–15.

IV.

In sum, the court GRANTS defendants' motion to dismiss [D.E. 53] pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction. Alternatively, the court DISMISSES the action pursuant to its discretion under the Declaratory Judgment Act.[5] The court DISMISSES Rose Acre's motion for summary judgment [D.E. 65]. The clerk shall close the case.

SO ORDERED. This 30 day of July 2015.

JAMES C. DEVER III
Chief United States District Judge

---

[5] In light of these conclusions, the court need not decide whether abstention is appropriate under Younger v. Harris, 401 U.S. 37 (1971), or Burford v. Sun Oil Co., 319 U.S. 315 (1943).